JOE G. BONE et al., Appellees, v. FRED D. MAY et al., Appellants.

No. 39191.

MAY 7, 1929.

REHEARING DENIED SEPTEMBER 30, 1929.

*W. S. Lewis, Tinley, Mitchell, Ross & Mitchell,* and *J. J. Ferguson,* for appellants.

*George H. Mayne, Genung & Genung,* and *Galvin, Byers & Sullivan,* for appellees.

GRIMM, J.—Briefly, it is claimed by the appellees that the

Missouri River, prior to the year 1895, had been steadily wearing away its east bank opposite certain lands of the appellees' lying east of the river, until, in 1895, it reached a line sometimes spoken of in the case as "the Dean line," which latter line appears to represent the most easterly advance of the river in that territory.

At the particular point in controversy, and at the time of the beginning of this suit, the east bank of the Missouri River ran substantially north and south. Immediately east of this east line of the Missouri River are, first, some government lots, and then, at the north, Section 13; and immediately south of Section 13 is Section 24; and south of Section 24 is Section 25. East of Section 24 is Section 19; east of Section 25 is Section 30; and east of Section 30 is Section 29. All of the land in controversy is between an east and west line on the north (being the north line of the south half of the north half of Section 13 projected), and another east and west line passing through the center of Sections 25, 30, and 29, projected to the river.

The Dean line, roughly speaking, so far as it is material in this case, intersects the north line of the property described, approximately a half a mile east of the east line of the river, as it flowed at the time this suit was filed, and it extended from that point in a southeasterly direction, passing near the northeast corner of Section 24, near the center of Section 19, and near the northwest corner of Section 29. At the south line of the property in controversy, this Dean line was more than two miles easterly of the east bank of the Missouri River. The territory in controversy, near the river, is approximately two miles wide, north and south.

In January, 1925, the plaintiffs (appellees) filed a suit in Mills County, Iowa, claiming ownership in certain lands through which or near which the Dean line passed, and also claiming all accretions attached to said lands and extending to the Missouri River. In February, 1926, Robert H. Poore (appellee) filed his cross-petition, alleging ownership in certain portions of the property through which or adjacent to which the Dean line passed, and also claiming accretions belonging to said lands and extending to the Missouri River. The plaintiffs also pleaded certain decrees, by and through which they claimed their title to some of these lands to have been quieted.

Generally speaking, the defendants filed answers denying

the alleged ownership by the plaintiffs of the lands claimed by them, and denying the force and effect of the decrees pleaded by the plaintiffs, and alleging ownership in the various defendants of certain of the lands in controversy, and claiming that certain of the defendants held the title to portions of the accreted lands under conveyances to them by parties who, together with their grantors, had, for more than ten years, been in full, open, notorious, peaceable, and uninterrupted adverse possession, under claim of ownership and color of title to said property. They alleged that they had paid the taxes on certain of these accreted lands. As to some of the lands, they claimed rights under certain alleged agreements by one of the plaintiffs to convey certain of the lands in controversy. Defendants also pleaded some rights to some of the accreted lands, based on certain decrees in actions to quiet title. It is also claimed by some of the defendants that, as to some of the lands in controversy, the Missouri River, in moving eastward, instead of moving slowly and gradually, suddenly changed its course to the east, cutting off a certain block of the land in controversy. This is what is known in law as an "avulsion." With the exception of the lands claimed to have been involved in the said avulsion, all of the lands between the Dean line on the east and the east bank of the Missouri River on the west, in the area hereinbefore described, are accretions, and attached to the lands abutting on the Dean line.

Certain agreements were entered into between the parties plaintiff, by which certain government lines extended towards the Missouri River became the dividing line between individual ownerships.

I. On January 26, 1929, there was filed in this court a motion to strike from the files appellants' denial of appellees' amended abstract, and appellants' amended and additional abstract. On March 2, 1929, there was filed a motion to strike appellants' arguments, and for the submission of the case on briefs and arguments on file when default occurred. These motions were submitted with the case, and are overruled.

II. In the case of *Payne v. Hall*, 192 Iowa 780, this court stated the principles of law relating to the title to the bed of navigable streams and to the riparian lands and accretions thereto along such streams. It is unnecessary to restate these principles of law. They are controlling in this case. It is claimed by

some of the defendants that a portion of the land in controversy, located in Sections 25 and 30, was not eliminated in the eastward movement of the east bank of the river which finally resulted in the Dean line, but that the river bank suddenly changed its course, creating an avulsion of these lands last referred to. There was introduced in evidence a plat showing the approximate location of the river bed through these two sections (25 and 30) in 1910, and again in 1920. On the east and west center line of said Sections 25 and 30, the east line of the river in 1910 and in 1920 is widely divergent. This alleged avulsion area between these two lines comprises, roughly speaking, about 600 acres of land. The claim of avulsion is principally based on the testimony of one B. E. Homan, living in the village of Bellevue, who, prior to that time, lived on an island in the river. He claims long familiarity with the Missouri River at that point, and he claims to know how and when the river at that point changed from the 1910 to the 1920 line. The principal part of his testimony on the subject is as follows:

"I know how that channel was made [the 1920 line]. I went along about 3 o'clock in the afternoon, and the river was high, and been coming up, and I stood there about 5 or 10 minutes, right where I was at, and I begin to see some timber start to go down, and the trees were 40 or 50 feet high, and I went closer to the river, and I looked downstream. There was 10 acres started to go down. I seen it go out of sight,—went clean blank out of sight, entirely; and when I went down the next morning, that channel was wide open. Before that, I had been over on the land as far east as the river, and between the new channel that was formed at that time and the channel of the river by Folsom, there was willow and cottonwood still over there to the east, and they are there yet."

"Cross-examination.
"The river cut through Section 25 in July, 1919 or 1920."

On the trial there were many witnesses, several of whom spent more or less time on or near some of these lands during or about the time of this claimed avulsion. A sudden change of the course of the Missouri River, affecting 600 or more acres of land, would, we think, attract considerable attention. It is altogether

likely that it would have been known by everybody living in that territory, for miles around. With the diligence of research displayed in the preparation for the trial of this case, some of these witnesses would undoubtedly have been found, to corroborate the testimony of Homan. His own story, as it is set up in the record, is far from being clear or convincing. Having in mind the general conditions in that immediate vicinity, as shown by the record and the various plats in evidence, and having also in mind the number of witnesses presented on the trial on behalf of the defendants, who claimed to have more or less intimate knowledge of the facts surrounding the land in controversy, we find the Homan story altogether improbable. There is evidence in the record tending to dispute the Homan story. The trial court had a much better opportunity to test the credibility of the Homan story, and we are content with its decision in that regard. Furthermore, the presumption is in favor of accretions, as against avulsion. *Kitteridge v. Ritter*, 172 Iowa 55.

III. All the remaining questions in this case pertain, in the main, to conflicting claims of titles by conveyances, of titles by adverse possession, and of rights based upon various actions to quiet title, including claims that certain actions were barred by limitation. These questions are, in the main, questions of fact only. They will be treated together.

From the whole record, it satisfactorily appears that the Missouri River had, in the year 1895, eaten its way eastward through the land in controversy to the Dean line. Under such circumstances, the law applicable has been previously clearly stated by this court in *Payne v. Hall,* supra, as follows:

"Where the lands of a riparian owner have been slowly and gradually eroded by a navigable stream, and the river has usurped and taken up the location of said land, the riparian owner of the land at the newly formed river bank becomes entitled to the accretions that may thereafter be formed against said bank, even though they should extend over the same territory where lands of a former riparian owner had been located before the erosion took place."

The same authority, by way of explanation, states:

"For example, if A is a riparian owner upon a navigable

stream, and B owns land remote therefrom, and by erosion the river cuts away all of the lands belonging to A, and leaves B as the riparian owner on the newly formed bank of the stream, and thereafter the river slowly retires from this situation and places accretions against the newly formed bank, said accretions will belong to the riparian owner B, even though they extend over the very space formerly occupied by the riparian owner A.''

This is the law in Iowa and many other states. See cases cited in *Payne v. Hall,* supra, on page 784. By the application of the foregoing principles to the facts as shown in the record in this case, all the land within the territory under consideration, westerly of the Dean line to the east line of the Missouri River, became the property of those who, in 1895, held title to the lands immediately east of and abutting on the Dean line, or their grantees. All former titles to the lands west of the Dean line were wiped out by this action of the river. All government subdivision lines westerly of the Dean line were obliterated and canceled. No claim of title could be based upon any title in the eroded area held prior to the time when this land westerly of the Dean line was swallowed up by the river. No conveyances of land westerly of the Dean line could be based upon former government descriptions. No actions to quiet title could be based on descriptions therein following government descriptions of lands swept away by the river in its slow march to the Dean line.

Some claims in this case are based upon what is said to have constituted adverse possession. Efforts were made by various parties to make valid conveyances based upon alleged adverse possession. There is much conflict in the record as to where the east bank of the river was on certain dates when, or about the time when, certain conveyances were made, and as to the then possession by various parties of certain portions of the land. There is a vast amount of testimony in the record bearing upon the extent to which certain portions of the land were cleared and cultivated, and bearing upon the question as to whether the possession of some of the parties was such as to constitute adverse possession, as known in the law. It appears from the record that the greater portion of these lands was covered, for certain periods of time involved in this case, with willows and small timber of various kinds. Other portions were wet and swampy. Only very

limited areas were reduced to anything bordering on continuous cultivation.

The record is very voluminous. Appellees' amendment to appellants' abstract is extensive. Some of the exhibits which would have been helpful to this court are not before us. We have laboriously read the record, and have felt compelled to re-read parts of the record several times. Any amount of discussion of the evidence offered on behalf of the contending parties which could be reasonably incorporated into an opinion could be of no possible benefit to bench or bar.

The record fails to satisfy us that any title adverse to the plaintiffs was obtained by any of the defendants to any of the lands in controversy by adverse possession.

We think the trial court was right in its findings in reference to the ownership of the plaintiffs (appellees) in lands, as set forth in the decree, and we think the action of the trial court in quieting title in the plaintiffs, as set forth in the court's decree, was right.

We have given careful consideration to every claim of the appellants', and readily reach the conclusion that the case should be, and it is,—*Affirmed*.

ALBERT, C. J., and EVANS, FAVILLE, and KINDIG, JJ., concur.