DARTMOUTH COLLEGE, a corporation, plaintiff-appellee, v. GERALD ROSE et al., defendants; STATE OF IOWA, intervenor-appellant.

No. 51481.

(Reported in 133 N.W.2d 687)

MARCH 9, 1965.

534

Lawrence F. Scalise, Attorney General, Robert Scism, Assistant Attorney General, and Michael Murray, of Logan, for intervenor-appellant.

Sifford, Wadden & Davis, of Sioux City, for appellee.

MOORE, J.—Plaintiff's quieting title action claims ownership of real property lying west of the Missouri River in Woodbury County and a large tract west thereof bounded on the north by the center line of Section 15 and on the south by the south line of Section 22, Township 27 North, Range 9 East of the Sixth P.M., in Dakota County, Nebraska. For brevity we omit the pleaded description which is also set out in the trial court's decree.

Defendants were eliminated by default before trial and are not parties to this appeal.

The State of Iowa intervened claiming to be owner of the approximately 600 acres of the tract in Woodbury County and described as a tract "bounded on the east by the right (west) bank of the Missouri River; on the west by the State boundary line between the States of Iowa and Nebraska as established by said states and approved by the United States in 1943; on the north by the center line of Section 15, Township 27 North, Range 9 East of the Sixth P.M., extended from said west boundary line to the right (west) bank of the Missouri River; on the south by the south line of Section 22, Township 27 North, Range 9 East of the Sixth P.M., extended from said west boundary line to the right (west) bank of the Missouri River, located in Woodbury County, Iowa."

Both plaintiff and intervenor claim ownership of this disputed area on the theory of accretion. Plaintiff contends it formed as accretion to the west or Nebraska bank as the Missouri River was gradually moving easterly during the late 1930s. In-

tervenor claims it formed as an island between 1927 and 1937 as the main channel was making a movement westward and that an avulsion took place in July 1937 when the main channel shifted from the west to the east side of the disputed area without destroying the land.

The trial court held there was no avulsion in 1937, the river had moved gradually to the east and the disputed land formed by accretion or reliction to plaintiff's land. From a decree quieting title in plaintiff, intervenor has appealed and asserts each of these findings and conclusions is erroneous.

The rules applicable to questions of accretion and title to land so formed have frequently been analyzed by us and need little review here. The parties are not in disagreement over the legal propositions involved. We state some of them briefly.

■ The Missouri River is a navigable stream and under Iowa law the State owns the bed to the ordinary high-water mark, in so far as such bed is within this State. Preamble, Constitution of Iowa, page LXVIII, Code of 1962; Payne v. Hall, 192 Iowa 780, 185 N.W. 912; Solomon v. Sioux City, 243 Iowa 634, 51 N.W.2d 472. In Nebraska a riparian owner owns to the thread of the channel. Whitaker v. McBride, 197 U. S. 510, 25 S. Ct. 530, 49 L. Ed. 857; Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N.W. 647.

Prior to the 1943 Iowa-Nebraska Boundary Compact, the State boundary line was the thalweg of the Missouri River and followed movements of the thalweg, except where the State boundary had become separated from the thalweg by an avulsion. Nebraska v. Iowa, 143 U. S. 359, 12 S. Ct. 396, 36 L. Ed. 186. Nothing in the Iowa-Nebraska Boundary Compact affects private titles or determines ownership. Rand v. Miller, 250 Iowa 699, 95 N.W.2d 916.

■ An avulsion is a sudden and rapid change in the channel of a stream where the old bed is changed and the stream seeks a new one. Nebraska v. Iowa, supra; Bone v. May, 208 Iowa 1094, 225 N.W. 367.

■ There is a presumption of accretion as against an avulsion. Kitteridge v. Ritter, 172 Iowa 55, 151 N.W. 1097; Bone v. May, supra.

■ Accretion is the gradual and imperceptible formation of land by action of water. Solomon v. Sioux City, supra, 243 Iowa 634, 51 N.W.2d 472; Wilcox v. Pinney, 250 Iowa 1378, 98 N.W. 2d 720; State of Iowa v. Raymond, 254 Iowa 828, 119 N.W.2d 135. Title to accretion land vests when such land arises above the ordinary high-water mark. Meeker v. Kautz, 213 Iowa 370, 239 N.W. 27; State of Iowa v. Raymond, supra.

■ In Iowa, an island which forms in a navigable river upon and over State-owned riverbed is considered accretion to the bed and is owned by the State as is all accretion thereto. Meeker v. Kautz, Solomon v. Sioux City and State of Iowa v. Raymond, all supra.

■ The fact that at times river water flows around sandbars or part of them does not make them islands. Payne v. Hall, supra, 192 Iowa 780, 185 N.W. 912.

■ With these legal principles in mind we turn to the record. One hundred eighty-five exhibits consisting of plats, charts, ground and aerial photographs, covering various periods of time, were introduced and have been certified to us. Each has received our careful study in conjunction with our reading and rereading of the printed record and briefs and arguments. Many sharp and substantial conflicts appear in the record regarding the contentions of the parties. Space will not permit us to describe the many exhibits or relate in detail the testimony of the experts and other witnesses. Such an effort would be of little value to the bench and bar. We will refer only to the particular facts we think are decisive of the case.

The exhibits clearly show the restless Missouri River was true to form in this area from the 1920s until its channel was stabilized in its present location by the efforts of the U. S. Army Corps of Engineers. It had wandered east and west through the area involved. Its channel or channels often changed. In the late 1930s some exhibits show three channels. One west, one east and another through part of the area. The latter was the result of the engineers' efforts but it again changed in the early 1940s after the corps' work was interrupted during the war. Many exhibits show the southern part of the area remained west of the channel despite its many changes farther north.

The location, number and extent of sandbars at various times cannot be adequately described. The expert witnesses disagree on what the several exhibits show in this regard.

After the war the work of the corps of engineers was resumed. Before plaintiff started this case in 1960 the river had been brought under control. Its only channel was in Iowa. Plaintiff, the Nebraska riparian landowner, in the Nebraska court had quieted title west of the Iowa-Nebraska boundary established in 1943. Plaintiff seeks here to quiet title to the land lying between the boundary line and the west high bank of the present channel.

Plaintiff's witness John Laros, with a bachelor of science degree in Geodetic Sciences and Photogrammetry from Ohio State University, related his experience as a registered professional land surveyor and in map drawing from aerial photos and his observations in the area between 1958 and 1960. He testified in great detail of his study of the many exhibits and demonstrated his conclusions therefrom. He expressed his opinions of the river channel changes, washing out of sandbars and the formation of the land now in dispute. His opinion was that it formed as accretion from the Nebraska side or right bank to the east. Vigorous cross-examination by experienced counsel failed to change his opinion.

Laurence H. Hart, plaintiff's second witness, testified he worked with the corps of engineers starting in 1932 and pointed out on various exhibits the location of the channel or channels at various times, including a pilot channel which the corps caused to run through the area during the late 1930s. On cross-examination he testified he was unable to recall whether the change of the thalweg from the west side to the east side of a bar north of the area was a gradual or sudden change.

Emery E. Runge, Sioux City lawyer, testified he had owned land south of the area since 1923, his north line was 100 rods south thereof, he was there practically every week or weekend during the summer, he spent his vacations there, he observed the river closely and described the changes made by the channel and the formation of bars in the river which he said always consisted of sand. He had no recollection of any sudden change of the river in 1936, 1937 or 1938 prior to the digging of the pilot channel.

Based on his knowledge, experience and ownership of land along the Missouri River, his observation of it and his examination of photographs in evidence, Runge expressed the opinion the land here in dispute formed as accretion to the west bank of the river.

Intervenor's principal witness, Raymond L. Huber, chief design engineer of the corps of engineers, engaged in stabilization work on the Missouri River, described his summer monthly inspections on the river since 1936. He identified many of the photographs and copies of reconnaissance maps of the river in the vicinity of the land involved and particularly to the north thereof. They had not been taken or prepared by him but were records from the corps' office. He pointed out what in his opinion was sand and vegetation between east and west channels in 1936 and 1937. He testified the southern part was within the north boundary of the area in dispute. By use of the reconnaissance maps he attempted to demonstrate the thalweg had changed from the west to the east channel between July 6 and August 4, 1937, and the land remained in the same location. He did not express an opinion an avulsion had taken place.

He testified he had no personal eyewitness recollection of this section of the river in 1936 and 1937 and his opinions were based primarily on Exhibit 25, an aerial photograph taken November 10, 1936, and another aerial photograph, Exhibit 150, taken October 20, 1937, and the reconnaissance maps.

Intervenor's other witness, Gerald J. Jauron, from 1927 to 1936 lived on an Iowa farm northeast of the area involved. His testimony relates mainly to the river channel on the Iowa side during those years and vegetation and sandbars about 800 feet north of the area. He also identified many photographs taken by him in 1960, 1961 and 1962 of trees and growth in this same area.

We have set out only a small part of the testimony of each witness to show the sharp conflict in the evidence on which the parties base their contentions and arguments. It would serve no good purpose to set out further details of the evidence.

This is an equity action and as such is triable de novo in this court. However, when considering the credibility of the witnesses we give weight to the fact findings of the trial court. No citation

of authority is necessary. See rule 344(f)7, Rules of Civil Procedure. From the printed record we are not afforded the opportunity to pass on the credibility of the witnesses based on appearance and conduct and thus the rule. In this case much depends on the credit to be given testimony of those expressing opinions. They used the many exhibits to demonstrate the bases of their conclusions.

In addition to the presumption against the happening of an avulsion in the summer of 1937 as contended by the intervenor, no witness testified to such an event. We repeat what is said in Bone v. May, supra, 208 Iowa 1094, 1097, 1098, 225 N.W. 367, 368: "A sudden change of the course of the Missouri River, affecting 600 or more acres of land, would, we think, attract considerable attention. It is altogether likely that it would have been known by everybody living in that territory, for miles around."

Intervenor's contention that an avulsion took place is not only weakened by its failure to produce a witness with personal knowledge of a sudden change of the course of the river but it is expressly negatived by the testimony of the witness Runge.

After giving careful consideration to every claim of the intervenor-appellant we conclude the trial court properly held the land in question to be accretion to plaintiff's property and approve the decree.

We have consistently attempted to minimize the costs of appeals to this court and therefore direct the clerk to assess the cost of printing appellee's brief and argument at $1.50 per page ($90) rather than $3.00 per page ($180) as certified.—Affirmed.

All JUSTICES concur.