## NORTH LITTLE ROCK URBAN RENEWAL AGENCY ET AL *v.* E. E. VAN BIBBER ET AL

5-5903 483 S.W. 2d 223

Opinion delivered July 24, 1972

[Rehearing denied August 28, 1972.]

*Kenneth Coffelt,* for cross-appellant G. D. Nelson.

*John Harmon,* for North Little Rock Urban Renewal Agency.

*Patten, Brown & Leslie* and *Langston & Langston,* for appellees.

J. Fred Jones, Justice. E. E. Van Bibber was the owner of two lots and a building thereon at the corner of Pike Avenue and 10th Street in the City of North Little Rock. On the first day of November, 1967, he leased these premises to G. D. Nelson for a term of 12 years at a monthly rental of $400. This lease concluded with a clause as follows:

"It is agreed between the parties hereto that this lease is not assignable."

Nelson went into possession of the premises under his lease and operated a drive-in restaurant business in the building especially designed for such purpose on the property. On or about April 29, 1969, Nelson sold his equipment and the good will of the business to Douglas D. James for $40,000 to be paid $6,000 down and $34,000 in monthly installments of $521.72 each. In connection with this sale a written assignment of the lease from

Van Bibber to Nelson was prepared but was never signed by Van Bibber. During the course of the negotiations between Nelson and James, it became apparent that the property might be taken by the North Little Rock Urban Renewal Agency; consequently, they entered into an agreement on May 28, 1969, under which Nelson and James agreed that should the North Little Rock Urban Renewal force the business to be moved from its present location, James should have an option as follows:

> "1. To forfeit all monies paid in, let Mr. Nelson deal with the Urban Renewal on satisfying the lease and in return Mr. Nelson would cancel all notes, sales, contracts, bills of sale, etc.
>
> 2. Mr. James to deal with Urban Renewal on satisfying the lease and fulfill all obligations under the contract."

On September 24, 1971, Mr. James gave notice to Mr. Nelson as follows:

> "* * *[W]e hereby exercise our option as follows: To deal with Urban Renewal on satisfying the lease and fulfill all obligations under the contract.
>
> In performance and execution of our option, we will continue to make payments on a certain promissory note dated April 29, 1969, in the principal amount of $34,000.00 on which there is a present principal balance due of approximately $25,000.00, according to its terms and conditions until the same is paid in full."·

This litigation originated when on February 16, 1971, Mr. Van Bibber filed suit in the Pulaski County Chancery Court against Nelson, James and the North Little Rock Urban Renewal Agency setting out the lease he had entered into with Nelson and alleging that Nelson had breached his lease contract by assigning it to James without the knowledge and consent of Van Bibber for the sum of $900 per month. Van Bibber alleged that North Little Rock

Urban Renewal Agency was threatening to take the property and would do so unless restrained by court order. Van Bibber prayed that the lease between him and Nelson be canceled and that the North Little Rock Urban Renewal Agency be restrained and enjoined from taking the property.

The North Little Rock Urban Renewal Agency filed its answer and counterclaim against Van Bibber seeking a condemnation of the property under right of eminent domain. The counterclaim sought immediate possession of the property and a determination of the damages to which the plaintiff Van Bibber was entitled. By amended answers both Nelson and James asserted leasehold interests under their respective leases and agreements, and they prayed compensation in damages for the taking.

Following trial, the chancellor found that the North Little Rock Urban Renewal Agency had the power of eminent domain and that it was necessary for it to take the property in question. The chancellor found that the fair market value of E. E. Van Bibber's reversionary interest amounted to $101,376.11; that the remaining value of the lease from Van Bibber to Nelson amounted to $28,832.89, entitling Van Bibber to $130,209. The chancellor further found that the separate leasehold interest amounted to $64,264.87, and that James was entitled to the fair market value of this leasehold interest. The chancellor entered a decree directing the Urban Renewal to pay to Van Bibber the aforesaid sum of $130,209 and to James the sum of $64,264.87.

On appeal to this court the North Little Rock Urban Renewal Agency relies on the following points for reversal:

"The trial court erred as a matter of law in ruling that the covenant prohibiting assignment of the lease between Van Bibber and Nelson had not been breached and ruling that condemned property was subject to leasehold interest.

The formula used by the Court in determining the damages to the leasehold was not a proper approach and constituted an error of law. In addition, the amount awarded for the leasehold was not supported by substantial evidence.

The Court erred in allowing the testimony of Jim Hood, Frank Ashcraft, W. H. Pitcock and Jack Farris as expert witnesses."

G. D. Nelson also appeals from the chancellor's decree and relies on the following point:

"The decree of the trial court in favor of James against Nelson is contrary to both the law and the evidence."

As to the appellants' first point on breach of the contract by assignment, James contends, and the chancellor found, that the contract between Van Bibber and Nelson simply provided that the lease was nonassignable but did not provide for a cancellation of the lease in the event the lessee attempted to assign it. The appellees further contended, and the chancellor so found, that Van Bibber had ratified the actions of Nelson in assigning the lease or subleasing the property to James. Our decision in *Fort Smith Warehouse Co. v. Friedman,* 111 Ark. 15, 163 S. W. 175, cited by the appellants is distinguishable on its facts from the case at bar. In *Friedman,* a two year lease contract not only contained a clause providing that the lessee should not assign the lease nor sublet the premises without the written consent of the landlord, it also contained a clause which provided that if the lessee should assign the lease or sublet the premises without the landlord's consent, the landlord might terminate the lease and take possession of the premises without giving any notice in writing to quit. This court in *Friedman* applied the general rule that:

"where the lease, by its terms, imposes restrictions on the right of a tenant to assign or sublet the premises, and also contains a provision for re-entry and forfeiture of the lease by the landlord, upon breach

of these covenants the landlord may declare the lease terminated and take possession of the premises."

We are unable to say that the chancellor's findings on these points are against the preponderance of the evidence.

In the case at bar James was actually paying to Nelson the agreed monthly payments of $521.72 on the purchase price of the equipment and good will of the business, and in addition he was paying to Nelson the $400 per month which Nelson was obligated to pay to Van Bibber as rent. The record indicates that on at least two or three occasions Van Bibber found James in complete control of the business; he was completely satisfied with James' operation of the business and he also received and accepted the $400 rental directly from James for at least a period of a few months prior to the commencement of this action. See *Purnell* v. *Atkinson,* 248 Ark. 401, 451 S.W. 2d 734; *Corning Roller Mills* v. *William Kelly Co.,* 159 Ark 1, 250 S..W. 895. We cannot say that the chancellor's finding that an assignment of the lease had been made to James by Nelson and ratified by Van Bibber is clearly against the preponderance of the evidence. Our conclusion on this point also disposes of the appellants' argument that the chancellor erred in ruling that the condemned property was subject to a leasehold interest. We, of course, have held that a lessee of condemned property is entitled to damages for the value of his leasehold interest separate and apart from the lessor's reversionary interest. *Ark. State Highway Comm'n.* v. *Polk,* 250 Ark. 377, 465 S. W. 2d 671.

Urban Renewal argues that the formula used in determining the damages to the leasehold in this case was not a proper approach and constituted an error of law. It argues that the amount awarded was not supported by substantial evidence and it cites *Ark. State Highway Comm'n* v. *Fox,* 230 Ark. 287, 322 S.W. 2d 81; and *Hot Spring County* v. *Crawford,* 229 Ark. 518, 316 S.W. 2d 834, in support of this argument. In the *Fox* case the lessee's monthly average sale of gasoline at one cent a gallon was admitted in evidence as going to show that his lease was a very valuable

one. The trial court in that case went further and allowed $1,000 damages to filling station equipment or for relocating the equipment and this was what we held to be error.

In the *Crawford* case, *supra,* a highway was widened between the Crawford's home and their truck stop cafe and the grade was lowered in the process. As one method of establishing the taking of the land and the lands remaining, the Crawfords were allowed to show that their net profits from the operation of the cafe were $4,000 per year and this net profit per annum was capitalized in arriving at the determination of damages. That case is distinguishable from the case at bar in that the market value of the property taken was the measure of damages in the *Crawford* case and this amounted to the difference in the before and after taking value. A footnote in *Crawford* calls attention to an annotation in 134 ALR 1125 and in the cited annotation appears the following:

> ". . . it seems proper to draw a distinction between income which represents the profits earned by a business conducted on the land in question (which would, of course, be attributable in many instances not only to the property itself but also to such other considerations as market conditions, the skill and knowledge of the proprietor of the business, etc.) and income which is attributable solely or primarily to the use of the property itself, such as rents."

In *Crawford* we cited with approval from the Colorado case of *Denver* v. *Quick,* 113 P. 2d 999. In that case the City of Denver condemned and took 800 acres of agricultural land leaving a residue of 160 acres. Evidence as to the income from the sale of cattle and dairy products was admitted and in discussing the city's contention that the evidence as to profits was not admissible in that case, the court said:

> "The city asserts that the reception of this testimony was violative of the general rule, that evidence of profits derived from a business located on the land taken is not properly admissible as a basis for com-

puting the market value of such property in condemnation proceedings . . . . The fallacy of the argument on behalf of the city on this point does not lie in the rule itself, which, it is stated in American Jurisprudence, supra, has been followed with remarkable unanimity in American jurisdictions, but emanates from its inapplicability to the situation under consideration. This misconception, in our view, arises from the city's failure to distinguish between income from property and income from business conducted upon the property, which distinction furnishes the criterion for the applicability of the rule."

The case of *Housing Authority of L. R.* v. *Rochelle,* 249 Ark. 524, 459 S.W. 2d 794, is more in point with the case at bar and in *Rochelle* we said:

"Capitalization of income is a recognized method of arriving at the fair market value of real estate used to produce rental income, in determining just compensation in eminent domain cases. We have long held evidence of rental value to be admissible as a factor to be considered in determining just compensation."

As to this point in the case at bar, we are dealing with the value of a lease rather than the before and after value of the property. In *Rochelle, supra,* in distinguishing that case from *Hot Spring County* v. *Crawford, supra,* we strongly implied that this method (capitalization of income) is acceptable when the income of the property consists only of rent.

Jack Farris testified as an expert witness (his qualifications as such having been stipulated to by the parties) that in arriving at the value of the leasehold in this case he used a percentage of the gross sales made by the lessee on the property. This witness testified that the rental value of such businesses as restaurants, drive-ins, etc. is generally recognized in the locality as running from six to 10%, and that he considered 8% as proper in this case. As to the qualifications of Jim Hood, Frank Ashcraft, W. H. Pitcock

and Jack Farris as expert witnesses, they were qualified to the satisfaction of the trial court on direct examination and the question directed to them on cross-examination only went to their qualifications as expert appraisers rather than to the basis for the appraisals they made.

In *Ark. Land & Cattle* v. *Anderson-Tully*, 248 Ark. 495, 452 S.W. 2d 632, we said:

"It is argued that the witness lacked the necessary education, training and other qualifications to make his opinion evidence on the issues in the case admissible. Determination whether an expert witness is sufficiently qualified lies within the sound judicial discretion of the trial judge. *Ratton* v. *Busby*, 230 Ark. 667, 326 S.W. 2d 889. This court will only reverse the decision of a trial judge on this determination in extreme cases where there is manifest error or a clear abuse of discretion. *Keeton* v. *Bozark*, 232 Ark. 588, 339 S.W. 2d 123; *Arkansas-Louisiana Gas Co.* v. *Maxey*, 245 Ark. 15, 430 S.W. 2d 866. We find no such abuse of discretion here."

Also in *Ark. State Highway Comm'n* v. *Watson*, 248 Ark. 422, 451 S.W. 2d 741, we said:

"The pertinent rule is well stated in 5 Nichols, Eminent Domain, § 18.42:

'While dealers in real estate, local officials and other witnesses who are supposed to have a special science and skill in appraising real estate are commonly spoken of as 'real estate experts,' they are not expert witnesses in the narrower meaning of the phrase. In other words, the general skill and knowledge of his subject which such a witness is supposed to possess is not in itself enough to qualify him to give an opinion of value in an eminent domain proceeding. He must, in addition to such general knowledge, be acquainted with values in the vicinity of the land in controversy, and he must be familiar with the property itself, or at least have examined it at or about the time of the taking."

The appellant Urban Renewal Agency has not pointed out in any specific respects how the chancellor abused his discretion in allowing the above named witnesses to testify as experts.

Mr. George Fox was an expert appraiser who testified for Urban Renewal in this case. He testified that he did appraisals over the entire State of Arkansas, the eastern half of Oklahoma, and some in Texas. He testified that he makes anywhere from 100 to 300 appraisals each year primarily for corporate clients including practically everybody in the United States including International Paper Company, Shell Oil Company, Humble Oil, Texaco, Gulf, Sinclair, Mobile, Union, and Citgo. He testified that he works regularly for the Rock Island and the Missouri Pacific Railroads and for Worthen Bank; that he has worked for Pulaski Federal Savings & Loan, for Federal Home Loan Bank Board in Little Rock; for Searcy Federal Savings & Loan and for Lakeside Country Club. He said he has also worked for the United States Forest Service at Russellville and Hot Springs; has worked regularly for the Arkansas Game and Fish Commission; has worked for Urban Renewal at Morrilton and Little Rock and he said he has worked regularly for Alcoa, Reynolds Metals, Homequity, Honeywell, Royal Typewriter, Western Electric, Southwestern Bell, etc. Mr. Fox testified that in his opinion the total value of the land and building taken was $40,000.

The appellant North Little Rock Urban Renewal Agency argues that its witness Mr. Fox was a higher qualified expert than the witnesses who testified for the property owners and that his testimony should have been accepted and considered by the chancellor as the only expert testimony before the court.

All the expert witnesses in this case, including Mr. Fox, testified that they used cost approach method, the market data approach method and the income approach method in arriving at their opinions. We are unable to say that the chancellor abused his discretion in not discarding the testimony of Jim Hood, Frank Ashcraft, W. H. Pitcock and Jack Farris as expert in favor of the testimony of Mr. Fox. The chancellor had all the witnesses before him as they

testified and he was in a better position to judge their qualifications as experts as well as the credibility of their testimony than we are on appeal. The question before us on this appeal is not whether we would have made the same findings and awards as the chancellor made had we been sitting in his place at the trial, but the question before us on this appeal is whether the findings and awards the chancellor did make were clearly against the preponderance of the evidence.

What we have already said also disposes of Nelson's point on appeal. In anticipation of the possibility that Urban Renewal would take the property under eminent domain, Nelson gave James the option of: (1) Canceling the contract of purchase in which event Nelson would look to Urban Renewal for his damages; or (2) James could abide by and perform the terms of the contract of purchase in which event Nelson would receive the full amount of the sale price from James, and James would look to Urban Renewal for such damages as he might sustain because of the taking. James elected to proceed under the second option.

We are unable to say that the chancellor's findings, and the decree based thereon, are against the preponderance of the evidence.

The decree is affirmed.

FOGLEMAN, J., concurs in the result.