JACOB SHERBONDAY, Appellant, v. WILLIAM SURRING et al., Appellees.

**ADVERSE POSSESSION:** Intent in Taking Deed. Ouster and adverse possession against remaindermen may not be predicated on a deed in fee from the life tenant when the grantee admits that he intended, under said deed, to take whatever interest the grantee had, *and no more.*

*Appeal from Allamakee District Court.*—H. E. TAYLOR, Judge.

JUNE 23, 1922.

REHEARING DENIED SEPTEMBER 23, 1922.

ACTION to quiet title. The trial court found for defendants. Plaintiff appeals.—*Affirmed.*

*Stilwell & Stilwell* and *E. R. Acres,* for appellant.

*William S. Hart,* for appellees.

ARTHUR, J.—Defendant Augusta is the wife of defendant William Surring. Other defendants brought in as defendants, on the application of defendants Surring, are the children of plaintiff's wife and her former husband. The former husband, Butler, and defendant Augusta Surring were brother and sister, so that defendant William Surring was the brother-in-law of plaintiff's wife, and an uncle by marriage of her children. The children join with Surring in the claims set up by him in his answer, and make no complaint that the court established the lien in favor of Surring for the $400 and interest. Plaintiff

argues that such claim is barred by the statute and by laches; but it is no affair of his whether the lien is or is not established, unless, perhaps, plaintiff has shown that he is the owner of the land. The trial court decreed that the claim of Surring should not be a lien on the life estate of plaintiff's wife, and that such lien could not be enforced against or terminate the life tenancy held by plaintiff. The record title to the 80 acres in question is in defendant William Surring by warranty deed from William Butler and wife, Minnie, now the wife of plaintiff. This deed was executed, delivered, and recorded early in 1885. It is not quite clear from the evidence what the consideration was. Defendant Surring assumed and paid off a mortgage of $600, and paid off the Ulrich note which he had signed with Butler. As we understand it, the consideration was $900, $600 of which was the mortgage. Plaintiff so claims in argument. When defendant agreed with plaintiff's wife that she should have a life estate and the children the land, subject to the life estate, the consideration was what defendant Surring then had in the place, and interest. He had paid out something for improving it, getting out stumps, etc. Defendant charged·no profit, and says that he thought the land was worth $2,000, but that his wife wanted him to do the best he could for his wife's only brother; that he did not charge $2,000 because he did not have that amount in it. Defendant Surring says that, after he bought the place, there was about $400 left in defendant's hands, after paying bills and moving Mrs. Butler onto the place. The consideration for the original purchase by Butler, about 1878, was $800. Butler traded a horse as first payment, and gave a note secured by defendant Surring for a part of it, and a mortgage back to Butler's grantor for the balance. Butler built a cabin, and started to clear up a home. The first note matured, and he appealed to the defendant for help. Defendant referred him to other parties, from whom Butler was unable to secure a loan; and Surring then gave his own note for the required amount. One of Butler's horses died, and he told Surring that he was going to throw up the farm, with his debts, and move to town and work for wages. To this Surring objected, and asked Butler where it would leave him on the notes; and thereupon Butler agreed to deed the farm to Surring, to get his money out of it,

if he could. Thereupon, Butler and wife deeded the farm to Surring, under the agreement, as defendants say, that Butler could buy the farm back in a year for what Surring had in it. Before Butler's death, he returned to Surring the option to repurchase, and by agreement the option was destroyed. Surring took possession of the land as soon as Butler moved off, and hired a man to dig stumps.

It is claimed by Mrs. Sherbonday that her husband had $1,000 when they came from Wisconsin and first bought the land; but, under all the evidence, we think this is not the fact, and that, on the contrary, he was substantially without means, except his team and emigrant's outfit. Her own evidence, her petition for guardianship, showing but $75 as property of the children, other exhibits, and defendants' evidence quite clearly show that her version of the matter as to his worth when they came to Iowa is not the fact. Mrs. Sherbonday also claims that, when she bought the property back from Surring, when the life-estate paper was executed, she paid for the property in full, and that defendant told her there was nothing owing him; that she thought she owned the property. Plaintiff says he thought she owned it, at the time she executed the deeds to him. We shall not go into the details of the evidence as to this; but from all the evidence we think that the weight of the evidence and the circumstances are against her claim that the land was then all paid for, or that she thought she owned the land. We shall see later that she and her husband occupied the land for many years under the written agreement that she was to have a life estate, and it was not until they proposed to sell the land to Thomas that she tried to get a deed to all the property, instead of her life estate. The value of the land at the time of the trial was about $6,000. When it was proposed to sell it to Thomas, it was valued at $4,800. Defendant says he gave her the paper in regard to the life estate the year he moved her back on the farm.

In 1890, plaintiff's wife executed to plaintiff a warranty deed to the land, and acknowledged it as Minnie Butler. On the same day, she executed a correction deed, and acknowledged it as Minnie Sherbonday. The first deed was recorded in January, 1892, and the correction deed in May of the same year.

The appellant seeks to overcome defendant's record title, claiming that, under claim of right, color of title, and adverse possession, he is the owner of the property; and he asks that his title be quieted.

When Butler and his wife, Minnie, executed the deed to Surring in 1885, it was understood that they might repurchase the land within one year, according to the testimony of some of the witnesses, and within three years, according to others. Mrs. Sherbonday's then husband, Butler, was drowned, soon after the execution of the deed, leaving six young children. It seems to be conceded that there was no legal liability upon Butler's employer for his death, but he gave a check, which, according to the testimony of defendant Surring and plaintiff's wife, was $800, $200 of which was for the benefit of the widow, Minnie, and $100 each was for the children. There is a conflict in the evidence as to whether the check was made payable to defendant Surring, as he claims, or to the widow, Minnie. The lawyer Quigley, acting for some of the parties at that time, testifying for plaintiff, says that the check was for $600, and that there was nothing said about its being part for the widow and part for the children. The transaction was about 30 years before he testified. William Butler was not a financial success. He left some bills unpaid, and no administration was taken out. It is testified by defendant Surring, and conceded by plaintiff's wife, as a witness for plaintiff, that Surring did, with her consent and approval, pay some of the bills of deceased. There is some dispute between them as to the amount. Surring also paid for provisions for her and the family, bought a cow or two, and so on, which substantially exhausted the widow's part of the money received; and we take it that a small amount, at least, of the children's share was expended for clothing and other things. Though no administration was taken out, we suppose that a part of the recovery for Butler's death would go to the children, had there been administration. In any event, that is a matter between the children and Surring, and they are not complaining. The widow and children lived in town for a time, after her husband's death. Surring suggested that she go to her people in Wisconsin, but she preferred to move back onto the farm; and Surring says he moved her back onto the land in question, with

his own team. She claims that Surring agreed to give her a deed to the property. This he denies; and he claims (and his contention in regard to this is sustained by the weight of the evidence) that, instead of a deed, he gave her a writing, by which the widow, Minnie, was to have a life estate in the property, and the children were to own it, subject to her life estate and subject to a lien in favor of Surring of $400 and interest, balance due him on the purchase price, when he reconveyed the property, or rather, gave plaintiff a deed that she was to have a life estate and the children were to own the property. Surring says he told her that the money going into the land was the children's money, and that she would have no interest, except the right to have it for a home as long as she lived;. that that is all he ever told her; and that she said that was all she wanted. Surring says this contract was all she ever had from him. The $400 just referred to represents the amount still owed to him for what he had in the land. He also claims that, after the settlement for Butler's death, he had about $400, or a little more, left in his hands, belonging to the children; and for this, though the property was worth more, they were to have the land. The writing given by Surring to Mrs. Butler so stated. By reason of this, he claims that the children own the land, and that he holds the legal title in trust for them, subject to her life estate. The arrangement was somewhat informal, but the mother was perfectly satisfied with it, and so expressed herself. She occupied the premises thereunder for nearly 30 years, as will appear later in the opinion. The children have never expressed any dissatisfaction with the arrangement, and are now standing with Surring. No guardianship was taken out by Surring in regard to the money in his hands belonging to the children. The mother at one time made an application for the appointment of a guardian in regard to the sale of a lot in town, which was appraised and sold for $75. These circumstances are referred to partly to show that neither plaintiff nor his wife thought they owned the land outright, as they now claim to do. They used and occupied this land under the life lease for nearly 30 years before demanding a deed from defendant, and this was when they contemplated selling the property, about 1914. Though defendant William Surring holds the legal title to the land, the

answer alleges that he holds the title in two capacities,—one as
security on the premises for the unpaid purchase price due him,
as before stated; and that, subject thereto, the children, who are
the sole surviving heirs at law of William Butler, deceased, and
Minnie Butler, now Sherbonday, surviving widow, now the wife
of plaintiff, own the land, Minnie having a life estate, subject
to the lien aforesaid. The trial court sustained the contention
of defendant Surring, and entered a decree in accordance there-
with. The decree provides, in substance, that the entire interest
of plaintiff in the premises is a life estate during the life of his
wife, with the usual privileges, benefits, duties, and obligations
of a tenant; that said life tenancy is confirmed, paramount to
the lien of Surring; that, subject to the life tenancy of plain-
tiff's wife, decreed and confirmed in plaintiff, Surring has a
lien on the premises, as against the reversionary estate, in the
sum of $400, with interest, as claimed by Surring; and that, sub-
ject to said lien and the life estate, the six other defendants are
the owners of the premises in question, and their respective
ownerships and interests are established, confirmed, and quieted.

The writing by which defendant gave Minnie a life estate,
and the balance to the children, subject to his lien, was doubtless
somewhat informal. But that such an instrument was executed
and delivered to the widow, is not seriously disputed, nor are its
contents. Surring testifies thereto, and the widow, Minnie, con-
cedes that some such paper was given to her, and says that she
could not read English, but that her son read it to her, and that,
a few days after its execution and delivery, she took it to a
notary, who read it and explained it to her. This instrument
was executed soon after the decease of William Butler, and be-
fore Minnie's marriage to plaintiff, and before the execution of
the two deeds in 1890, and before the execution of the deeds by
plaintiff's wife to him. We have no doubt that she and the chil-
dren moved onto and occupied the premises thereunder for many
years after her marriage to plaintiff. The paper was not re-
·corded, nor was it produced in evidence. It appears that she
retained it some 27 or 28 years, when, about the year 1913 or
1914, the date not being entirely clear, the plaintiff, having a
prospective purchaser for the land, in one Thomas, desired to
perfect his title. At about that time, plaintiff's wife met the

defendant Surring and demanded a deed from him, and threw the writing creating a life estate in her, in Surring's lap in the sleigh. Surring gave it back to her, or tried to, and threw it back in the road; and he says he does not know where the paper is now. Plaintiff was present at that time. Plaintiff's wife seemed satisfied with the arrangement during all these years, and made no objection thereto; and we are satisfied from the record that that is the arrangement she wanted made, for the benefit of her children, and that she might have a home. Defendant argues that one reason he thought it would be better for her not to have a deed was that she might marry again, and the children might be deprived of the use of the property with their mother. That does not appear in the record, however. It does appear that she preferred to live near Surring, her brother-in-law, and it was suggested that, under all the circumstances, a life estate would be better for her and better for the children. Surring testifies that, in discussing the matter, Mrs. Butler stated that she wanted the children to have all the land; that he said he had seen cases where the parents had been turned out of house and home by the children, and that he would fix it so that she could have a life estate; and that she said that was all she wanted. The mother, in her testimony, attempts, in a way, to dispute the testimony of Surring; but, taking her conduct and all the circumstances and her evidence all together, with all the other evidence, we are satisfied with Surring's version of the transaction.

Plaintiff was 80 years of age at the time of the trial, and his wife, Minnie, 62, and defendant Surring, 73. Plaintiff testifies that he does not know when he was married. She says they have been married 32 years. The trial was had in August, 1920. This would fix the date of their marriage about 1888.

This action was brought May 13, 1914. During the six or seven years of its pendency, the issues were changed somewhat, and the depositions of plaintiff and his wife were each taken three or four times, some of them three or four years apart. There is some contradiction in the testimony they gave in their different depositions. There is evidence tending to show that, a year or two after plaintiff married Mrs. Butler, there was some difference between them as to plaintiff's duty and obligation

to support the children, and that he thought he ought to have whatever interest his wife had in the land; that it ought to be transferred to him because of the burden of the children. Appellee contends that, when the deeds were made to plaintiff, there was no intention of enlarging the estate then held by the wife from a life estate, or of setting up an assertion of a higher estate or hostile title. True, a deed was drawn by a notary. We think that this thought is sustained by the evidence of plaintiff himself, who, referring to the deed from his wife, and to the life-estate writing given her by defendant Surring, says:

"A. She didn't give me any deed, only the deed that Surring gave her. I took the deed he gave her. That deed wasn't good, he says. Q. What I want to know is whether or not your wife ever gave you a deed to the land? A. No, nothing more than just—no more than that deed I tell you about,—than that deed that comes from Surring. She ain't got her deed, and I suppose that she couldn't make a deed until she gets her deed. When I married Mrs. Sherbonday, she had six children. She turned her interest in the land to me, to support the children. The only title I got for that land was whatever interest she had; turned it over to me to support the children, until they were able to do something for themselves. All did for themselves from the time they were 14 or 15, except one, that was adopted out. Made arrangements after I married her a couple of years. We talked the matter over. I thought that I didn't feel able to raise those children for nothing. If they had an interest in it, they would have to take it, and if she owned it and was willing to make me safe, I would do my part. Q. You took what interest she had, and thought, if they owned it, they would have to pay their share? A. Yes, sir. Stayed in possession of the farm while the children were home, and also after they left, under the arrangement with the wife. Q. You claim whatever interest in the land your wife had? A. That's all I know about it. Q. And that is the claim—whatever interest she had? A. That's all I could claim, of course. Q. And if she had no interest, you had no interest? A. Why, that's the way I look at it, right along. Q. If you owned it, you wanted to know it; and if you didn't own it, you wanted to know it? A. Yes, sir. * * * I sold the land to Thomas in this way: $60 if we could

make the title—get it straightened up so we could get him a deed of it. Thomas took possession two years ago. For the use of it, he keeps up the interest on the mortgage.''

There was a written contract between the plaintiff and Thomas in regard to the sale, but plaintiff testifies that Thomas did not live up to his contract. When plaintiff married Mrs. Butler, she and the six children were living on the 80 acres in question. Plaintiff so testifies, and that he began to farm the land, and did so up to the time Thomas took possession, except a year or two when he rented it out. Surring testifies that, when Mrs. Butler moved back on the farm, she moved into a log house which Butler had built, and that, when she married plaintiff, they went to live on his place. After the marriage, the wife and children moved to an adjoining 40 acres, owned by plaintiff; but, as said, he continued to carry on the 80 in question. This was before his wife executed the deeds in 1890, and he continued in the same after the deeds. Plaintiff says he got the use of it all the time, kept up the fences, and built new fences; that no one claimed he did not have a right to use it.

''Nobody said a word to me about it. Surring lived on his farm, cornering this 80. We supposed we owned it, and had a right to sell it.''

In plaintiff's deposition, taken in 1916, he testifies that he paid no taxes, but kept up the property after he married Mrs. Sherbonday. In his deposition filed in 1920, plaintiff says he paid the taxes after he got the deed. It does not appear that either Mrs. Sherbonday or her husband made any other claim to the land, except a life estate, to Surring, the title holder, for many years, at least up to the time the paper was thrown into the sleigh, about 1913 or 1914. About that time, plaintiff tendered $1.25 to defendant Surring, and demanded a quitclaim deed. This was in the winter of 1914. Another circumstance relied upon by appellant is the statement testified to by witness Burnham, about the time defendant moved Mrs. Butler back onto the farm,—a statement made by Surring to the authorities that Mrs. Butler, or she and the children, owned the land, and were entitled to a deed; but it appears without substantial dispute that Surring was then trying to get a school road for the children, and some objection was made by the school

authorities or township authorities that she did not own the land. As a part of the maneuvers, it appears that defendant Surring executed a deed running to her. This was for the purpose of trying to get the school road. He failed in this, and bought the road himself, and the deed was destroyed. It was never delivered to Mrs. Butler, and she never made any claim thereunder, and does not now, nor does her husband. Burnham's testimony was given some 30 years after the alleged conversation. Surring denies that he made the statement testified to by Burnham, but concedes the execution of a deed under the circumstances just stated.

We have stated the evidence somewhat in detail, without attempting to state all the circumstances. One or two preliminary matters may be disposed of before going to the real question in the case, as we view it. At one time, the date not being shown, one Dull claimed the road across the 80; but plaintiff testifies that he brought suit against Dull for driving across the land, but that Dull beat him in court. It is true, as argued by appellant, that the court found that a life estate had been created in plaintiff's wife, without any pleading on her part asking it. She is not a party to this action. She got the life estate, and the children the reversion, because of Surring's willingness that they might do so. He had held the legal title for many years. His contention is that that was the agreement. But it should be kept in mind that Surring is defending against plaintiff's claim to be the absolute owner of the land, and in so doing, sets up what he claims the arrangement was. All the defendants are willing that she shall have the use of the land during her lifetime. Appellees make some claim that plaintiff may not maintain the action because of the contract to sell to Thomas. Appellant argues to the contrary. We shall not stop to discuss this question, but go to the real merits.

Appellant's propositions on the main point are that, where a warranty deed, purporting to convey a full and complete title, is executed and delivered by a person holding a life estate, which deed was recorded, and where grantee takes possession and remains in possession, claiming to the world absolute ownership, improving the land and paying the taxes, this will ripen into title against the remaindermen, and such deed will form a

basis for adverse possession in the life tenancy of grantee; that the remaindermen out of possession are authorized to bring action to quiet title during the life of those through whom they claim; and that the remaindermen should have done so during the statutory period of limitations. While the cases seem to hold that this may be done, some of them hold that the reversioners are not compelled to do so. On these propositions they cite *Murray v. Quigley,* 119 Iowa 6; *Garrett v. Olford,* 152 Iowa 265, 269; *Crawford v. Meis,* 123 Iowa 610, 617, 619; *Wenger v. Thompson,* 128 Iowa 750, 756; *Lougee v. Shuhart,* 127 Iowa 173; *Stern v. Selleck,* 136 Iowa 291, 295.

Under the proposition as stated, plaintiff seems to concede, inferentially at least, and for the purpose of the argument, that plaintiff's wife had only a life estate. The proposition also assumes that the deed from plaintiff's wife to him purports to convey a full and complete title. This may be true, on the face of the deed. But it must be remembered that the plaintiff is himself the grantee in the deed, and his own evidence shows that, instead of purchasing the fee title, he understood that he was only purchasing whatever interest his wife had. Furthermore, as before shown, the occupancy of the land by plaintiff and his wife for nearly 30 years was under the writing creating a life estate in plaintiff's wife. Their occupancy was rightful, during all those years, under the life estate contract, and such occupancy was referable thereto, rather than to the deeds executed in 1890. There was no change of possession after the execution of the deeds and referable thereto. Plaintiff and his wife continued to use and occupy the land from the date of the deeds in 1890 until 1914,—24 years,—the same as before the deeds, before demanding a deed from defendant. We do not overlook the fact that, in one part of Mrs. Sherbonday's testimony, she claims that she asked for a deed at the time and before the life-estate contract was given her; but the weight of the evidence is that she was satisfied with the life-estate arrangement, and that the premises were occupied for many years thereunder. It is true that plaintiff and his wife now say that they supposed they owned this land; but the weight of the evidence shows that the use and occupation by plaintiff and his wife for over 30 years did nothing to indicate the renunciation of the rightful and un-

questioned life estate of plaintiff's wife, under the writing exe-
cuted to her by Surring, or an assertion of a different or greater
ownership as against Surring, the holder of the legal title,—
at least until 1914. This suit was brought within a few months
after plaintiff asserted title under his deed, and tendered $1.25,
and demanded a deed from Surring. Though the deeds from
plaintiff's wife to plaintiff were recorded in 1892, the evidence
does not show that Surring had any actual notice thereof or of
any claim by plaintiff thereunder until this suit was brought, in
1914, or about that time. Defendant testifies that he did not
know of the deeds until about the time suit was brought. When
the deed from plaintiff's wife was recorded, in 1892, she and
plaintiff had, for some years, been in rightful, unquestioned pos-
session, under the life title, which possession continued there-
after; and neither renounced or surrendered such title or changed
the character of the possession until this suit was brought, or a few
months before, in 1914. As before shown, the plaintiff expressly
admits that, in taking the deeds from his wife, it was the pur-
pose to transfer only what actual interest she had, and no more.
Under the circumstances of this case, such deeds, so executed,
did not constitute an ouster, or set up adverse possession. Con-
cededly, Surring has the legal title, and has had since about
1885—now 37 years. The presumptions are in favor of the legal
title. Plaintiff has the burden. Surring is not now acting and
has not acted against the interests of the children, but is pro-
tecting them. Indeed, it is not claimed that he is even now
acting against the interest of plaintiff's wife, since he seems to
be protecting her interest in the land in regard to the life estate.
Before plaintiff can overcome Surring's legal title, the evidence
ought to be clear and convincing. It is not such. We shall not
separately discuss the cases cited by appellant, or distinguish
them in their facts from the instant case. They are doubtless
applicable to cases involving a different state of facts. Under
the record in this case, we think the cases cited by appellees are
more nearly in point, and support our conclusion. *Casady v.
Casady,* 184 Iowa 1241, 1248, 1249; *Harris v. Brown,* 184 Iowa
1288, 1293; *Patty v. Payne,* 178 Iowa 593, 600; *Burns v. Byrne,*
45 Iowa 285, 288; *Bader v. Dyer,* 106 Iowa 715, 720; *First Cong.
Church v. Terry,* 130 Iowa 513, 518; *Hume v. Long,* 53 Iowa

299, 303; *Clarke v. Dirks,* 178 Iowa 335, 340, 345; *O'Dell v. Browning,* 182 Iowa 223, 236. See, also, *Joslin v. Beam,* 187 Iowa 1090. This was a homestead case, but the question of possession was involved, which possession was referable to one writing, rather than to another.

Defendant Surring is quite severely criticized by counsel for appellant in argument; but, so far as we can see from the record, he seems to have been actuated by a spirit of kindness towards the widow and children in their early afflictions, and was attempting to protect their interests, particularly the children's. We think the equities are with defendants. Our conclusion is that the decree of the district court was right.—*Affirmed.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.