STATE of Iowa ex rel. IOWA DE-
PARTMENT OF NATURAL
RESOURCES, Appellant,

v.

BURLINGTON BASKET COMPANY,
Appellee.

No. 00–0364.

Supreme Court of Iowa.

Sept. 5, 2002.

Thomas J. Miller, Attorney General, David R. Sheridan and Michael H. Smith, Assistant Attorneys General, for appellant.

John M. Loeschen of Loeschen & Loeschen, Burlington, for appellee.

TERNUS, Justice.

This case concerns the claim of the appellant, State of Iowa, to an island in the Mississippi River known as Keg Island. The district court concluded that the State had not carried its burden to prove its sovereign ownership of the land and so dismissed the State's petition to quiet title. The State appeals and we affirm.

I. *Background Facts and Proceedings.*

Keg Island is an uninhabited, 128–acre island located in that part of the Mississippi River flowing between Iowa and Illinois. The State of Iowa believes it has sovereign claim to Keg Island based on the island's location on the Iowa side of the river's main navigational channel.

In the 1980s and again in the mid–1990s, the Department of Natural Resources (DNR) posted signs on Keg Island relating to the public's use and hunting upon the sovereign islands of Iowa. In 1994 or 1995, DNR employees saw evidence of logging and noticed signs claiming the island belonged to a basket company. Upon investigation, the State learned the appellee, Burlington Basket Company (BBC), claimed title to the land by virtue of an Illinois record chain of title that commenced in 1899. Although BBC was not in possession of the land, it periodically harvested lumber from the island to use in its basket-making business.

The State initiated this lawsuit against BBC to quiet title and to enjoin BBC from future logging on Keg Island. The State's claim of title rested on its sovereign right to ownership of islands on the Iowa side of the Iowa–Illinois boundary in the Mississippi River. BBC raised the affirmative defenses of real party in interest and laches.

The matter was heard in a three-day trial at which several expert witnesses tes-

tified concerning the manner and timing of Keg Island's formation, as well as its location. In the trial court's subsequent decision, it rejected BBC's affirmative defenses, but concluded the evidence was in equipoise with respect to the State's claim. The court ruled that although the State's evidence came close to proving its sovereign ownership of the island, it fell short. Accordingly, the court denied the State's request to quiet title and to enjoin BBC from future activities on the island. The State appealed.

II. *Scope of Review.*

An action to quiet title to real estate is in equity, *see* Iowa Code § 649.6 (1999), and, therefore, this court's review is de novo. *See Krotz v. Sattler,* 586 N.W.2d 336, 339 (Iowa 1998). Accordingly, we are not bound by the trial court's factual findings or its legal conclusions. *See id.* We do, however, give weight to any credibility findings made by the trial court. *See* Iowa R.App. P. 6.14(6)(*g*).

III. *General Principles of Law Governing Ownership of Navigable Rivers.*

■ Before addressing the issues in this case, we think it is helpful to have a frame of reference provided by a review of the general legal principles that govern title disputes involving navigable rivers. Upon admission to the Union, a state holds title in its sovereign capacity to the bed of any navigable river or stream within its borders. *Block v. North Dakota,* 461 U.S. 273, 277, 103 S.Ct. 1811, 1814, 75 L.Ed.2d 840, 847 (1983); *Robert's River Rides, Inc. v. Steamboat Dev. Corp.,* 520 N.W.2d 294, 299 (Iowa 1994); *State v. Sorensen,* 436 N.W.2d 358, 361 (Iowa 1989). In Iowa, "[t]he state owns the bed of the river from the ordinary high-water mark to the center of the stream and the riparian owner

owns to the ordinary high-water mark." *Sorensen,* 436 N.W.2d at 361 (citations omitted). In contrast, in Illinois, a riparian landowner's ownership extends to the center of the navigable stream. *Buttenuth v. St. Louis Bridge Co.,* 123 Ill. 535, 17 N.E. 439, 445 (1888).

■ Where a navigable river or stream forms the border of a state, the boundary between the bordering states is not the geographic midpoint between the banks of the river. *United States v. Louisiana,* 470 U.S. 93, 108, 105 S.Ct. 1074, 1083, 84 L.Ed.2d 73, 84 (1985). Rather, the boundary is the "thalweg"—the middle of the main downstream navigable channel of the river. *Louisiana v. Mississippi,* 516 U.S. 22, 25, 116 S.Ct. 290, 292, 133 L.Ed.2d 265, 268 (1995); *Iowa v. Illinois,* 147 U.S. 1, 7–8, 13 S.Ct. 239, 241, 37 L.Ed. 55, 57 (1893). The United States Supreme Court has given the following explanation of this rule:

> When a navigable river constitutes the boundary between two independent states, the line defining the point at which the jurisdiction of the two separates is well established to be the middle of the main channel of the stream. The interest of each state in the navigation of the river admits of no other line. The preservation by each of its equal rights in the navigation of the stream is the subject of paramount interest.

*Iowa v. Illinois,* 147 U.S. at 7, 13 S.Ct. at 241, 37 L.Ed. at 57.

■ Where several channels exist, the "main channel" of the river is "the middle of the principal one, or, rather, the one usually followed" by boats. *Id.* at 13, 13 S.Ct. at 241, 37 L.Ed. at 59; *accord Holman v. Hodges,* 112 Iowa 714, 717, 84 N.W. 950, 951 (1901). The principal navigable channel is not necessarily where the water is the deepest. *Minnesota v. Wisconsin,* 252 U.S. 273, 282, 40 S.Ct. 313, 319, 64 L.Ed. 558, 564 (1920). As the

Court noted in the *Minnesota v. Wisconsin* case, "vessels do not follow a narrow crooked channel, close to shore, however deep, when they can proceed on a safer and more direct one with sufficient water." *Id.*

Of course rivers change over time and several rules have evolved to address such developments. One change that occurs is caused by accretion—"a gradual and imperceptible addition of soil to the shore line by the action of the water to which the land is contiguous." *Meeker v. Kautz*, 213 Iowa 370, 372, 239 N.W. 27, 28 (1931). As between states bordering a navigable stream, the boundary line remains the center of the channel even though the banks may change through the process of accretion or erosion. *Nebraska v. Iowa*, 143 U.S. 359, 360, 12 S.Ct. 396, 397, 36 L.Ed. 186, 187 (1892). Thus, in Iowa, land that accretes at or above the ordinary high water mark on the Iowa shore line becomes the property of the landowner on whose shore it attaches. *Mather v. State*, 200 N.W.2d 498, 500 (Iowa 1972). On the other hand, accretions to the bed of a navigable stream in the form of islands occurring on the Iowa side of the thalweg belong to the State of Iowa. *Sorensen*, 436 N.W.2d at 361; *Dartmouth College v. Rose*, 257 Iowa 533, 536, 133 N.W.2d 687, 690 (1965); *accord* 72 Am.Jur.2d *States, Territories, and Dependencies* § 37, at 430 (2001) ("A newly formed island is part of the state on whose side of the main channel it forms.").

Another rule that is implicated in the present case is known as the island exception to the thalweg rule. The island exception provides: "[I]f there is a divided river flow around an island, a boundary once established on one side of the island remains there, even though the main downstream navigation channel shifts to the island's other side." *Louisiana v.*

*Mississippi*, 516 U.S. at 25, 116 S.Ct. at 292–93, 133 L.Ed.2d at 269. Thus, for example, if an island formed by accretion on the Illinois side of the thalweg, it would belong to the riparian owner in Illinois and this ownership would continue even though the main navigational channel later shifts.

A related rule concerns sudden and abrupt changes in a river channel known as avulsions. *See Dartmouth College*, 257 Iowa at 535, 133 N.W.2d at 689 (defining "avulsion"). An avulsion has no effect on the boundary line in a navigable stream even though it causes the main navigational channel to change:

> It is equally well settled that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein.

*Nebraska*, 143 U.S. at 361, 12 S.Ct. at 397, 36 L.Ed. at 188. With this background we now frame the issues presented in this appeal.

IV. *Issues.*

The essence of the dispute between the parties in this case can be traced to their disagreement on the fundamental question of timing. The State adamantly maintains that it has no obligation to prove the location of the thalweg in 1846 when Iowa joined the Union. Rather the State contends it is sufficient for it to show that the thalweg was east of Keg Island prior to 1899 when BBC's chain of title commenced. BBC is just as adamant in its contrary position. Thus, in order to properly identify the determinative factual issues in this case, we must first ascertain the relevant timeframe. We think that, in turn, depends on whether Keg Island or its progenitors formed before or after

1846. We will consider both alternatives, starting with the possibility that the island was already in existence when Iowa became a state.

The State's claim of title rests on its right as a sovereign state to ownership of border rivers from the thalweg to the high-water mark on the Iowa side, including islands attached to the riverbed on the Iowa side of the thalweg. Thus, contrary to the State's assertions, the relevant time frame is, initially at least, 1846, when Iowa became a state and its borders were established. To determine the land to which Iowa acquired sovereign title at that time, however, we must look back even earlier to the period between 1818, when Illinois became a state, and 1846. That is because Iowa's borders in 1846 were subject to the situation then existing with respect to the pre-existing borders of the State of Illinois. *See Minnesota v. Wisconsin,* 252 U.S. at 280, 40 S.Ct. at 318, 64 L.Ed. at 563 (stating that border dispute between Wisconsin, which was admitted in 1848, and Minnesota, which was admitted in 1858, must be "determined upon consideration of the situation existing in 1846," the year in which Wisconsin's borders were established). Under the principles reviewed earlier, if Illinois' border had previously been set west of Keg Island, the island would remain in Illinois territory even if the channel later changed. *See Missouri v. Kentucky,* 78 U.S. 395, 401, 11 Wall. 395, 20 L.Ed. 116, 118–19 (1870) (holding Kentucky acquired ownership of any islands on the Kentucky side of the Mississippi River thalweg in 1792 at the time of statehood, and Missouri's boundaries were fixed at the time of its statehood in 1820 on this basis regardless of the relative location of the thalweg to the islands at that later time). It follows then that if Keg Island were in Illinois in 1846, the State of Iowa would not have acquired sovereign title to the island when its bor-

ders were established at the time of statehood, even if the island was located west of the thalweg at that time. Assuming, then, that Keg Island or its predecessors existed when Iowa joined the Union in 1846, the State would be required to prove Keg Island was located west of the principal navigation channel between 1818, when Illinois' borders were established, and 1846, when Iowa's borders were established.

Alternatively, if Keg Island or its predecessors did not exist when Iowa became a state in 1846, the State could prove it acquired sovereign title to the island by showing that the island developed by accretion west of the principal navigational channel, in other words, on the Iowa side of the river. *See Kansas v. Missouri,* 322 U.S. 213, 229, 64 S.Ct. 975, 983, 88 L.Ed. 1234, 1244 (1944) (stating that for Kansas "[t]o show sovereignty by island formation it was necessary to prove that the island formed on the Kansas side of the main channel"). Under this scenario, the island would belong to Iowa as an accretion to Iowa's territory.

In addition to the basic question of title, the State presents two preliminary matters that must be addressed. First, the State claims it is entitled to rely on a presumption that if the thalweg is now on the Illinois side of Keg Island, it is presumed that the island is in Iowa. In a related argument, the State asserts that BBC bore the burden to prove an ancient thalweg shift from the Iowa side of the island to the Illinois side of the island. At trial, the district court refused to indulge in the requested presumption and allocated the burden of proof to the State.

BBC argues on appeal, as it did in the trial court, that Keg Island (or its predecessor(s)) was in existence before Iowa's entrance to the Union but was located on the Illinois side of the thalweg at that

time. Therefore, under the island exception to the thalweg rule, argues BBC, the island remained Illinois territory even though the main navigational channel later switched to the east, Illinois side of the island. BBC disputes the propriety of any presumption to aid the State's case and asserts the State at all times bore the burden of proof.

We first address the parties' dispute with respect to the burden of proof and any applicable presumptions. After that, we will examine the evidence introduced at trial to determine whether we agree with the trial court's disposition of this matter.

### V. *Preliminary Issues.*

■ A. *Burden of proof.* The plaintiff in a quiet title action bears the burden of proof. *State v. Simmons,* 290 N.W.2d 589, 592 (Iowa 1980). Although a party's record title raises a presumption of ownership that may be overcome only by clear and convincing evidence, *see Wilcox v. Pinney,* 250 Iowa 1378, 1381, 98 N.W.2d 720, 722 (1959); *Sherbonday v. Surring,* 194 Iowa 203, 214, 188 N.W. 831, 835 (1922); 65 Am.Jur.2d *Quieting Title* § 75, at 56 (2001), neither party has relied on such a presumption here. Therefore, in the case before us, the State had the burden to prove its title by a preponderance of the evidence. *See Birdsall v. Goehring,* 173 Iowa 203, 207, 155 N.W. 269, 270 (1915) (discussing "preponderance of the evidence" in determining whether plaintiff in quiet title action had met his burden of proof); Iowa R.App. P. 6.14(6)(*f*) ("In civil cases the burden of proof on an issue is measured by the test of preponderance of the evidence.").

Notwithstanding the burden of proof resting on the State as plaintiff, the State spends considerable effort arguing that BBC had the burden to prove its "defense of foreign title," referring to BBC's claimed Illinois record title. The State asserts that the validity of BBC's Illinois title depends on whether there was an ancient thalweg shift that moved the boundary line from the Iowa side of the island to the Illinois side of the island, thereby invoking the island exception to the rule of the thalweg. Citing the Iowa court of appeals decision in *Shine v. State,* 458 N.W.2d 864 (Iowa Ct.App.1990), the State argues, therefore, that BBC had the burden to prove where the island was located prior to the 1880s. We disagree.

The State's arguments are contrary to the well-established principle that the plaintiff in a quiet title action must succeed on the strength of its own title and not on the weakness of the defendant's title. *Simmons,* 290 N.W.2d at 592. Therefore, the focus must be on whether the State proved that it had sovereign title to the island, not whether BBC had a valid record title. The absence of the latter is not proof of the former. As we have already discussed, the State's title depends on the location of the thalweg east of Keg Island between 1818 and 1846 or, if the island did not exist then, at the time of its subsequent formation. BBC's assertion that the main channel ran to the west of the island prior to the 1880s is not an affirmative defense; it is simply a matter of denial. As such, the burden of proof remained on the State to show the location of the island, notwithstanding BBC's evidence of record title. *See Lockie v. White,* 221 Iowa 1044, 1047, 267 N.W. 671, 672 (1936) (holding that plaintiff had burden to prove its own title even though defendant claimed ownership, citing rule that plaintiff must recover on the strength of his own title and not on the weakness of the defendant's title).

The State's reliance on the court of appeals' decision in *Shine* to support its argument that the defendant had the burden of proof is misplaced. In that quiet title

action the burden of proof shifted to the defendant only because the plaintiff had proved possession and record title to the disputed property, making the plaintiff the presumptive owner. *Shine,* 458 N.W.2d at 866. In the present case, the State proved neither possession nor record title. Therefore, the burden of proof did not shift to BBC.

B. *Entitlement of State to presumption.* The State also claims that it is entitled to a presumption that land currently located on the Iowa side of the thalweg is in Iowa. The State relies on this court's opinion in *Kitteridge v. Ritter,* 172 Iowa 55, 151 N.W. 1097 (1915), a land dispute between riparian owners on the Iowa and Nebraska sides of the Missouri River. In that case we considered whether the disputed land, admittedly on the east or Iowa side of the river, formed through the process of accretion of soil onto the Iowa side of the river or resulted from an avulsion of land from the Nebraska side of the river. *Kitteridge,* 172 Iowa at 57, 151 N.W. at 1097. Under the established common law principles discussed above, land formed by accretion on the Iowa side would be within the boundaries of Iowa, but land formed on the Iowa side from an avulsion of the river cutting off the land from its location in Nebraska would remain within the boundaries of Nebraska. *Id.* This court held that "[t]he land, being concededly on the east side of the Missouri [R]iver, is presumed to be in Iowa." *Id.* at 59, 151 N.W. at 1098. The court also applied another presumption: that the land "is presumed to be the result of accretion, and not of avulsion." *Id.*

The district court in the present case refused to apply the former presumption regarding location, reasoning it would violate the rule of the thalweg and the island exception. Consistent with the trial court's ruling, it appears this presumption

has been rarely applied and then only in cases where the dispute centers on whether land formed by accretion or avulsion. *See Arnd v. Harrington,* 227 Iowa 43, 48, 287 N.W. 292, 295 (1939); *Kitteridge,* 172 Iowa at 59, 151 N.W. at 1097 (citing cases). Because the issue in the present case does not turn on whether the property at issue formed by accretion or avulsion, we think the presumption employed in *Kitteridge* does not necessarily extend to controversies surrounding the formation of an island in a navigable river.

We turn then to general principles of evidence to determine whether it would be appropriate to presume from the current location of the thalweg that it existed in that same location at an earlier time. In considering this issue we have examined cases and authorities analyzing the probative value of proof that a condition existed at a certain time on the question of whether the same condition existed at a subsequent or prior time. *See generally* 29 Am.Jur.2d *Evidence* § 298, at 311–12 (1994). We note initially that case law from this state and others, as well as authorities in this area, properly categorize the relationship between these two facts— present existence and prior or subsequent existence—as an inference and not a presumption. *See, e.g., Stenberg v. Buckley,* 245 Iowa 622, 626, 61 N.W.2d 452, 454 (1953); *Stitzel v. Kurz,* 18 Md.App. 525, 308 A.2d 430, 437–38 (Ct.Spec.App.1973); *Jenkins v. Hawthorne,* 269 N.C. 672, 153 S.E.2d 339, 342 (1967); *Byrd v. Baltimore & Ohio R.R.,* 10 Ohio App.2d 187, 227 N.E.2d 252, 257–58 (1966); II John Henry Wigmore, *Evidence in Trials at Common Law* § 437, at 513–14 (1979) [hereinafter *Wigmore on Evidence*].

In *Stenberg,* a decision written after this court's 1915 decision in *Kitteridge,* we noted, "when it is said, for instance, that when a certain state of things or affairs is shown

to have existed at a given time, its continuance is presumed, what is really meant is that the showing of the existence at a specified time is admissible as evidence of the continued existence." *Stenberg*, 245 Iowa at 626–27, 61 N.W.2d at 454. This relationship between proof of one fact and the existence of another, we stated, is an inference. *Id.* at 627, 61 N.W.2d at 454. We further noted that whether such an inference "aids a litigant, depends upon whether the common knowledge and experience of men, as applied to facts shown, lead to the belief that ordinarily and usually further facts or consequences follow." *Id.* at 626, 61 N.W.2d at 454. Thus, an inference is simply "a reasoning process." *Id.*

Wigmore has a similar analysis in his treatise:

When the existence of [a] condition ... at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance *at a later date.*

The degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is in issue and the particular circumstances affecting it in the case in hand....

Similar considerations affect the use of *subsequent existence* as evidence of existence at the time in issue. Here the disturbing contingency is that some circumstance operating in the interval may have been the source of the subsequent existence, and the propriety of the inference will depend on the likelihood of such intervening circumstances having occurred as the true origin.... Here, as elsewhere, the *interval of time* to which any inference will be allowable must de-

pend upon the nature of the thing and the circumstances of the particular case.

The opponent ... may always attempt to explain away the effect of the evidence by showing intervening circumstances which raise a probability of change instead of continuance.

*Wigmore on Evidence* § 437, at 513–14; *accord* 29 Am.Jur.2d *Evidence* § 298, at 312.

Applying these principles to the present case, we conclude the fact Keg Island has been located on the Iowa side of the thalweg since the 1880s is merely some evidence from which a fact finder may infer that it was located on the Iowa side of the thalweg prior to 1846 or, if it formed later, at that later date. Whether a fact finder makes that inference depends on the entire circumstances shown in the record.

 We decline the State's request to give its evidence of subsequent location a presumptive effect. "[A] presumption is a *standardized* practice, under which certain facts are held to call for *uniform* treatment with respect to their effect as proof of other facts." 2 John W. Strong, *McCormick on Evidence* § 342, at 433 (5th ed.1999) (emphasis added) [hereinafter *McCormick on Evidence*]; *accord* 29 Am. Jur.2d *Evidence* § 181, at 201 ("In a sense, therefore, a presumption is an inference which is mandatory unless rebutted."). Although there are many reasons that can support the creation of a presumption, including the difficulty of proving the presumed fact, the most important consideration is probability. *McCormick on Evidence* § 343, at 437–38. As our later review of the expert testimony in this case will show, there are significant variables that diminish the probability that the location of Keg Island in relation to the thalweg in the first part of the nineteenth century was the same as its present location or even its 1880s location, including

the lengthy time interval and the possibility of intervening natural and man-made channel changes. Accordingly, we do not think it advisable to adopt a rule of evidence that would *require* a finding that the past location of an island vis-à-vis the main channel is the same as its subsequent location. Although the difficulty of proving the long-ago location of an island is apparent, we conclude it best to let the finder of fact decide, based on all the circumstances, whether proof of subsequent location is probative of prior location.

Having determined the State is not entitled to the benefit of any presumptions, we turn to an examination of the evidentiary record in this case.

## VI. *Summary of Evidence.*

We commence our discussion of the evidence with a summary of those matters that are not contested by the parties. Illinois became a state in 1818 and Iowa became a state in 1846. The thalweg of the Mississippi River forms the boundary between these states. Keg Island is presently located to the west of the main navigational channel or on the Iowa side of the river. It is approximately one-and-one-quarter miles long. Lying immediately to the north of Keg Island is Otter Island and immediately to the north of Otter Island is Turkey Island.

Examination of land records in Iowa and Illinois fail to reveal clear evidence of the existence of Keg Island when Illinois and Iowa were admitted to the Union. The earliest record title encompassing this property is found in Illinois in 1899, when Illinois title to Keg Island was transferred by quit claim deed to BBC's predecessor in title and the island was listed on the Mercer County, Illinois tax rolls.

The first official survey of Iowa territory along this portion of the Mississippi River appears to be an 1842 survey conducted by J.E. Whitcher pursuant to the following instructions: "[F]or the survey of the *valuable* islands in the Mississippi River, not heretofore surveyed, having regard to the timber or quality & location of soil, and those only which are embraced in this surveying district." (Emphasis added.) The instructions later reference "any island which you may find worth the expense of surveying." Although this survey showed several islands, including Turkey Island, none of those shown are believed to be Keg Island. The witnesses offered varying explanations for the absence of Keg Island from the Whitcher survey: (1) Keg Island did not exist in 1842; (2) if it did exist, it was located on the Illinois side of the thalweg; or (3) if it did exist and if it was located on the Iowa side of the thalweg, it was not significant enough to be included in the survey.

Chronologically, the next map introduced into evidence was one based on a survey made by Major General G.K. Warren from 1866 to 1869 (the Warren map). The evidence showed that at this time the United States Army Corps of Engineers was considering work on the river to ensure a continuous four-foot channel for navigational purposes. Warren's assignment was to examine the river to determine the best location for the proposed channel. In addition, Warren had two boats that were adapted for dredging. Historical documents showed that Warren undertook dredging operations in the Mississippi River during this period, but the exact location of any dredging was not ascertainable.

The map made under Warren's direction showed a series of five small islands near the center of the main channel where Keg and Otter Islands are presently located. The State's expert witness, Howard Christian, acknowledged that "the character of

the islands as shown on the Warren map ... would sort of support that the thalweg would have gone along the Iowa shore." A report by Warren was also admitted into evidence. In that report Warren described the behavior of the river in general, commenting that the channel would fill up with sand, become blocked, and then shift to another location, perhaps the other side of an island, and then the process would repeat itself, with the channel shifting back to its original location.

The first maps showing Keg Island in its present configuration were done under the direction of Lieutenant Colonel F.U. Farquhar in the late 1870s in preparation for the channel improvements. The first map, referred to as the compilation map, was a composite of all previous maps and surveys in the region. It was prepared in 1877–1878 and then copied and distributed to river men as a means of inducing a more uniform nomenclature of the localities. Like the Warren map, this map contained no record of depth soundings, but it did show a dashed line, designated as the "Steamboat Channel of 1877," that traveled down the river and around the islands. This line was to the east of Keg Island (meaning the island was on the Iowa side of the thalweg).

Through a comparison of the Farquhar compilation map and the Warren map, the State sought to establish that from at least 1869 the navigational channel was to the east of Keg Island or its progenitors. Christian, a retired civil engineer with the corps of engineers, testified on behalf of the State as to his interpretation of the maps. This witness illustrated through an overlay of the Farquhar map on the Warren map that the bank lines of the two maps were very similar and that the smaller islands on the Warren map appeared to have coalesced into Keg Island in the decade between the time the two

maps were made. Christian testified that he believed the location of the steamboat channel at the time of the Warren map in 1869 would likely have been the same as the alignment documented a decade later in the Farquhar compilation map.

A second map was prepared under Farquhar's direction from hydrographic surveys conducted of the river in 1878 and 1879. It showed depth soundings, bank lines, and islands, including an island—identified as Island 352—that closely corresponded with Keg Island. The Farquhar hydrographic map showed the same steamboat channel running to the east of the island, again placing the island on the Iowa side of the thalweg. In addition, the State entered into evidence various maps from 1887 through the 1930s that either designated the steamboat or navigational channel on the easterly, Illinois side of Keg Island, or included depth soundings showing the deepest water on that side.

Christian concluded from his review of the historical documents and his analysis of the river that the thalweg was located on the Illinois side of Keg Island at the time of the Warren survey in 1866–1869. He based his conclusion on two things: (1) his opinion that the thalweg was located on the Illinois side of Keg Island in 1878; and (2) the fact that the area around Keg Island is a relatively flat section of the river with low velocities, resulting in a diminished likelihood of physically-influenced changes in the channel. When asked specifically, however, where the thalweg was located when Iowa became a state, Christian responded that he did not know. He also acknowledged on cross-examination that a river channel could switch from one side of an island to the other side. Although he agreed that possibility existed with respect to Keg Island, he asserted it was not as likely to have happened there as compared with other

islands due to the particular configuration of the islands located upstream from Keg Island.

BBC sought to establish that Keg Island or its predecessors did in fact exist at the time of the Whitcher survey but because they were located on the Illinois side of the main navigational channel, they were not within the Iowa territory surveyed by Whitcher. BBC relied on the testimony of its expert witness, Dr. Stanley Schumm, who testified that Keg Island or its predecessor(s) was in existence at the time Iowa was admitted to the Union based primarily on two considerations: the stability of the river and the presence of presettlement alluvium sediment. By comparing the bank lines of the various maps, Schumm concluded that the river was relatively stable and consequently the islands shown on the Warren map in 1866, some of which he believed coalesced to form Keg Island, were in existence twenty years earlier at the time of Iowa statehood.

Schumm also relied on the report of a geomorphologist—an expert on island formation—who had analyzed the alluvial deposits on Keg Island. According to this report, core sediment samples taken from six locations on the island showed "the widespread presence of prehistoric island-deposited alluvial sediment" that was found below the "very distinctive alluvial sediment that is associated with cultivation and land clearance following Euro–American settlement." The presence of presettlement alluvium indicated the formation of the island prior to 1850 because "significant acceleration of runoff and soil erosion" that resulted in the post-settlement alluvium began in this area of the river in the 1850s and 1860s. The conclusion Keg Island formed prior to 1850 was also supported by the nature and location of the pre-settlement alluvium on the island and the low deposition rate of sediment prior to cultivation and consequent

soil erosion, signifying the island probably started to form considerably prior to the 1800s. The same physical findings also indicated, according to the geomorphologist, "that Keg Island consisted of a landform of significant elevation above normal low water prior to the time of Iowa statehood in 1846." Based on his study of the island and the soil analysis, Schumm believed that the island or its predecessors would have been of sufficient size to be valuable and, accordingly, included in the Whitcher survey *if* the island or its predecessors had been located in Iowa territory.

BBC also sought to discredit the State's reliance on the Farquhar maps to show the steamboat channel on the east side of the island. One of BBC's expert witnesses, James A. Simpson, testified that he thought the Farquhar hydrographic map was made for planning the work proposed by the corps of engineers, including creation of a navigation channel to the east of Keg Island. He contended that a flow arrow to the west of Keg Island on the second Farquhar map indicated the main flow of the river prior to any improvements was to the west of the island. Simpson believed the designation of a "steamboat channel" on the compilation map was an indication of where the corps had moved the channel through dredging sometime prior to 1878. Dr. Daryl Simons, a civil engineer specializing in water resource development, supported Simpson's theory that the main navigational channel originally lay to the west of Keg Island. He testified that a thalweg would not form on the inside of a curvature in the river as existed on the east side of the island and that the steamboat channel in that location was the result of dredging by the corps of engineers.

VII. *Analysis of Evidence and Conclusion.*

There appears to be no dispute that Keg Island has been west of the main

navigational channel since the corps of engineers stabilized the channel in that location in the 1880s. The determinative question, however, is where the island was located from 1818 through 1846 or, if it formed later, on which side of the channel it arose. Given the stability of the Mississippi River in this area, a fact upon which all experts agreed, one could infer from the island's existence west of the channel in 1877 that the channel existed in the same location some thirty to sixty years earlier between 1818 and 1846.

This inference is substantially weakened, however, by the testimony of BBC's experts. Evidence that the island or its predecessors had formed considerably prior to 1846 and would have been quite sizable by the time of Whitcher's survey in 1842 was unrebutted. It appears, then, that Whitcher's omission of the island from his survey indicates the island was on the Illinois side of the river in 1842. This conclusion is further supported by the natural tendency of the channel to follow the outside of a bend, which in this case is the Iowa bank. Additionally, there is a logical explanation for the later presence of the channel on the Illinois side of the island: dredging by the corps of engineers that had the effect of diverting the channel from the west side of Keg Island to the east.

But perhaps the evidence that most undermines the State's case is Warren's report of his observation of the Mississippi River in the 1860s and his description of the process whereby the channel would shift from one side of an island to the other side of the island and back again. Although the experts characterized the river as relatively stable, the documented occurrence of channel changes makes it difficult to locate the thalweg in 1818 or 1846 based on its position in 1877.

In summary, the location of the navigational channel east of Keg Island in 1877 up to the present date does not convince this court that it is more likely than not that the thalweg was east of Keg Island at the time of and prior to Iowa's statehood. Accordingly, we agree with the trial court that the State has not proved it acquired sovereign title to Keg Island when Iowa joined the Union in 1846. Therefore, we affirm the district court's denial of the State's petition to quiet title and for injunctive relief.

**AFFIRMED.**